## SINGER *v*. NARON.

### Opinion delivered June 19, 1911.

1. ADVERSE POSSESSION—POSSESSION OF COTENANT.—As a general rule, the possession of a tenant in common is the possession of his co-tenant. (Page 450.)

2. SAME—POSSESSION OF COTENANT.—In order for the possession of a tenant in common to be adverse to that of his cotenants, knowledge of his adverse claim must be brought home to them directly or by such notorious acts of unequivocal character that notice may be presumed. (Page 451.)

3. SAME—COTENANCY—DISSEIZIN.—Proof that plaintiff, a tenant in common, disappeared for twenty-two years, and was not heard from for the last thirteen years, and that defendants, the other cotenants, had divided up the land, in the belief that plaintiff was dead, and each had occupied the part allotted to him and had platted the land for a townsite, and made numerous sales, was sufficient to go to the jury upon the question whether there had been a disseiziu of plaintiff and an adverse holding by defendants and their grantees. (Page 452.)

4. DEEDS—RECORD AS NOTICE.—The record of a deed which is not in the line of a party's title is not constructive notice to him. (Page 453.)

5. DEATH—PRESUMPTION.—Though a tenant in common was absent from the State more than five years, during which time his cotenants did not know where he was or whether he was alive, no presumption arises that he was dead, in a subsequent action by him to recover his interest in an estate in common. (Page 453.)

Appeal from Bradley Circuit Court; *Henry W. Wells,* Judge; reversed.

### STATEMENT BY THE COURT.

Jefferson Singer died intestate at Hermitage, in Bradley County, Ark., on the 18th of November, 1873, owning about 800 acres of land on which he resided. He left surviving him his widow and seven children, who continued to reside on the land. A. J. Singer was put in charge of the land by his mother, and he managed it for five years. In November, 1878, he left Bradley County, riding a horse which he said belonged to the family. He first went to Louisiana, and then to Texas. At infrequent intervals he wrote to different members of the family and received replies from them. After 1887 no more was heard of him until 1909, at which time he returned to Arkansas, and asserted a claim to an undivided one-seventh interest in the land above referred to. The other children of the deceased, Jefferson Singer, not having heard of their brother since 1887 and believing him to be dead, divided up the estate between themselves, and executed deeds to each other to effectuate the partition. Each one of the children went in possession of that part of the land set apart to him, and ever since has occupied it, claiming it for his own. Subsequently to the partition, a railroad was located and constructed across a part of the land, and a townsite located thereon. Numerous lots have been sold and conveyed to various persons, to the number of about 150.

When the land was divided in 1895, a two-sevenths interest was allotted to J. M. Singer. J. M. Singer claimed to the other heirs that when A. J. Singer left he sold him the horse which he rode away, and that A. J. Singer gave him his interest in the land as security for the purchase price of the horse. On January 8, 1910, A. J. Singer instituted an action in the circuit court against his brothers and sisters, and the purchasers from them of the lands in controversy, to recover an undivided one-seventh interest therein. Other facts will be stated in the opinion. The case was tried before a jury, and a verdict was returned in favor of the defendants. To reverse that judgment, the plaintiff, A. J. Singer, has duly prosecuted an appeal to this court.

*B. L. Herring,* for appellant.

There is no evidence in the record to support a claim of adverse possession by appellees and their grantors as against appellant. Nothing in the evidence tending to show a disclaimer, disavowal or repudiation of appellant's title by his coheirs, and without such express disclaimer, etc., and notice thereof brought home to the appellant, there was no adverse possession by them as against his title. There is no such thing as the fiduciary relation of cotenants and at the same time the relation of adverse occupant and ousted owner among cotenants. The original entry and possession being that of cotenants, it continues as such until there has been a repudiation of the title on the part of the tenant in possession with notice thereof against those out of possession. 89 Ark. 22; 23 Ark. 735; 43 Ark. 469, 489; 86 Ark. 202, 205; 131 S. W. (Tex.) 1171, 1175; 61 Ark. 527, 540; 57 Ark. 97, 110; 132 S. W. (Ark.) 1002, 1003; 122 S. W. 232; 134 S. W. 180. The testimony shows that appellant's title and rights were recognized by his cotenants if he had not sold to J. M. Singer, at all times, and that they presumed that he was dead. There could be no repudiation of title against him as a dead man. In that capacity the statute of limitations would not run against him; and recognition of his title and rights otherwise shows that their possession was no adverse. 80 Ark. 444, 446; 128 S. W. (Tex.) 472, 475; 42 Ark. 118, 120; 45 Ark. 81, 89. The division of the land among the coheirs, and the subsequent execution and recording of quit-claim deeds, if intended as an act of ouster, would

not affect appellant's rights until he had notice thereof. 130 S.
W. 461, 462; 55 Ark. 104, 109; 69 Ark. 95, 98; 76 Ark. 525, 528.
The court erred in instructing the jury that appellant had notice
of the execution of the deeds of partition and of the recitals there-
in from the time the same were filed for record. The court
also erred in instructing the jury that appellant's cotenants were
entitled to presume that he was dead, after not hearing from him,
and having no knowledge of his continued existence for five
years.

*D. A. Bradham, Fred L. Purcell, M. Danaher* and *John T.
Hicks,* for appellees.

1. Appellant was not a tenant in common when he left in
1878, and has not been since that time, because in 1876 he and
his mother set apart and allotted to him a definite portion of the
lands, and thereafter he treated and claimed this portion as his
own, making improvements thereon until he left the State. All
of the family understood and acquiesced therein, and after all
had reached maturity ratified it. The parol sale by him to his
brother had reference to this particular portion of the land, and
although, being in parol, and within the statute of frauds, the
fact that it was followed by possession on the part of the brother,
which continued for more than seven years with all the necessary
elements, makes a good title in the brother. 57 Ark. 110.

2. One or more tenants in common may oust another by any
act of hostility which is sufficiently unequivocal and notorious to
be understood by the community in which the land in question is
situated. 30 Mo. 272, 77 Am. Dec. 614. When in 1895 the
heirs assembled to exchange mutual deeds, and the ques-
tion arose as to J. M. Singer's right to have deeded to
him the one-seventh share of appellant in the estate, and he agreed
to defend the other heirs and himself against any claim on the
part of appellant, the law will construe his act to be hostile; and,
this act being also open and notorious, and followed by open and
notorious possession continuing in J. M. Singer and his grantees
for fourteen years prior to the institution of this suit, it is clearly
sufficient as a statutory bar. 27 Am. Dec. 335; 90 Am. Dec. 448;
15 U. S. 596; 42 Ark. 289; 20 Ark. 359, 374-376.

3. Actual knowledge by appellant was not necessary. (a)

Actual notice was rendered impossible by the conduct of appellant. (b) The acts of the widow and six heirs in possession were such as to give him constructive notice of what they did. 90 Am. Dec. 451. (c) His knowledge of the facts was sufficient to put him upon inquiry, and the law presumes him to have had notice of those things that were reasonably to be expected. 7 Am. St. Rep. 579; 70 Fed. 529; 52 Fed. 838; 36 Pac. 364; 38 Pac. 521; 28 N. W. 409; 18 S. W. 355; 27 Tex. 355; 28 S. W. 360; 77 Am. Dec. 614.

4. Adverse possession as between tenants in common is a question of fact for the jury. 77 Am. Dec. 614; 2 Watts & Serg., 182; 4 Gratt. 16.

HART, J., (after stating the facts.) The principal question for the decision of the court is whether or not the plaintiff was barred of his right of recovery by the adverse possession of the defendants and their grantors. The general rule is that the possession of one tenant in common is the possession of his cotenant, but it is equally well settled that when one tenant in common can disseize another the difficulty is in determining what acts should constitute such disseizin or ouster. In the case of *Watson* v. *Hardin,* 97 Ark. 33, this court held: "Where, in a suit to quiet title by one claiming by adverse possession of the owner's widow, there is a question as to whether notice of the widow's repudiation of her husband's title was brought home to the heir, or was so notorious as to raise the presumption that he had notice thereof, the question of adverse possession of the widow is for the jury."

In the case of *Lefavour* v. *Homan,* 3 Allen (Mass.) 354, Bigelow, C. J., speaking for the court, said:

"It may, however, be safely said that a sole and uninterrupted possession and pernancy of the profits by one tenant in common, with the knowledge of the other, continued for a long series of years without any possession or claim of right and without any perception of profits or demand for them by the cotenant, if unexplained or controlled by any evidence tending to show a reason for such neglect or omission to assert a right, will furnish evidence from which a jury may and ought to infer an actual ouster and adverse possession."

In the case of *Sydnor* v. *Palmer*, 29 Wis., at page 249, Dixon, C. J., speaking for the court, said:

"The rule of law in such case very clearly appears to be that where one tenant in possession, having once acknowledged the right or title of the other tenants, seeks to oust or dispossess them, and to turn his occupancy into an adverse possession or enjoyment under an invalid or merely colorable claim of title to the whole, and so as to acquire the title of the entire estate by lapse of time under the statute of limitation, he must show when knowledge of such adverse claim, or of his intention so to hold, was brought home to the other tenants; for from that time only will his possession be regarded as adverse. *Willison* v. *Watkins*, 3 Peters 43, and *Whaley* v. *Whaley*, 1 Spears 225, are leading cases in this country upon this subject. See also *Lapert* v. *Todd*, 32 New Jersey Law (3 Vroom) 124; 3 Washburn on Real Property (3 ed.) 127 to 129, and Tyler on Ejectment and Adverse Enjoyment, 882, and authorities cited. Such is always the rule, unless the exclusive use and enjoyment or sole and uninterrupted possession and pernancy of the profits by one tenant in common have been so long continued as to give rise to the presumption of, or justify the jury in finding, knowledge and acquiescence on the part of the other tenants for the period of time prescribed by the statute."

The reason that the possession of one tenant in common is *prima facie* the possession of all, and that the sole enjoyment of the rents and profits by him does not necessarily amount to a disseizin, is because his acts are susceptible of explanation consistently with the true title. In order, therefore, for the possession of one tenant in common to be adverse to that of his cotenants, knowledge of his adverse claim must be brought home to them directly or by such notorious acts of an unequivocal character that notice may be presumed. This exception to the general rule is well settled, and has been recognized by the following authorities: *Manchester* v. *Doddridge*, 3 Ind. 360; *Dubois* v. *Campau*, 28 Mich. 304; *Johnson* v. *Toulmin*, 18 Ala. 50, 52 Am. Dec. 212; *Hilton* v. *Duncan*, 1 Cold. (Tenn.) 313; Wood on Limitation, (3 ed.), § 266; *Workman* v. *Guthrie*, 29 Pa. 495, 72 Am. Dec. 654; *Purcell* v. *Wilson*, 4 Gratt. (Va.) 16; *Warfield* v. *Lindell*, 90 Am. Dec. 451, 1 Cyc., pages 1074, 1075.

The exception to the general rule as above stated has met with general recognition, and has been applied by the courts according to the facts of each particular case, as will appear from an extensive case note in 10 L. R. A. (N. S.) 185. In the case at bar testimony on the part of the defendant shows that A. J. Singer left his home in 1878, leaving his mother and his brothers and sisters, most of whom were minors, in possession of the land in controversy until 1909 before he attempted to assert any claim or right thereto. His brother, J. M. Singer, testifies that he sold him the horse which he rode away, and that A. J. Singer pledged him his interest in the estate for the payment of the purchase price. It will be noted that A. J. Singer only wrote home at infrequent intervals, and never made any inquiry about his interest in the land. After 1887 he never even wrote to his mother or his brothers and sisters, all of whom were alive and continued to reside on the premises in controversy. Their testimony shows that they were anxious to hear from him. In the meantime, not having heard from him and believing him to be dead, and believing that he had pledged his interest to J. M. Singer for the purchase price of the horse which he rode away, they divided the land between themselves. Each went into possession of the part allotted to him, and remained in uninterrupted and exclusive possession of it until this suit was brought.

A railroad was located and constructed on a part of the land and a townsite surveyed and platted thereon. It was well known that, after partition of the land was made, each of the cotenants of plaintiff occupied the part allotted to him and claimed it as his own. Numerous sales were made of that part on which the townsite was located. These acts were open and notorious and known to all who lived in the neighborhood and all others who might take the trouble to inquire. During all this time the plaintiff made no inquiry about his rights to the land. It is true that A. J. Singer testifies that he believed they were holding the land for him, and that he did not pledge his interest therein to his brother for the payment of the purchase price of the horse which he rode away, but men do not ordinarily sleep upon their rights for so many years, and we hold that the fact that he did so, when taken in connection with the other facts and circumstances in evidence, will warrant a jury in finding an actual ouster and

disseizin of the plaintiff by his cotenants and an adverse holding by them and their grantees for the statutory period.

After the plaintiff's brother and sisters made partition of the land in 1895 and each one went into possession of his allotted share, they executed mutual deeds to each other. Some of these deeds were filed for record, and the court instructed the jury that placing the deeds in the recorder's office for record was notice to the plaintiff of the execution of the deeds. This was error. Both the plaintiff and the defendants, who are his brothers and sisters, derived title to the land as heirs of their deceased father. These partition deeds were not in the line of plaintiff's title, and he was not required to look for them. *Rozell* v. *Chicago Mill & Lumber Co.,* 76 Ark. 525; *Turman* v. *Sanford,* 69 Ark. 95.

The court also in effect told the jury that if the plaintiff left the State of Arkansas and stayed away for five years, during which time his brothers and sisters did not know of his whereabouts or existence, they, as a matter of law, had the right to presume him dead. This was error. Such instruction had no application under the facts of this case. The plaintiff was alive, and brought suit himself, and there was no presumption of law one way or the other in regard to his death. *Matthews* v. *Simmons,* 49 Ark. 468; 13 Cyc. 297.

Other assignments of error are pressed upon us for a reversal of the judgment, but we believe that they are disposed of by the application of the principles of law above announced, and need not be separately considered. For the error of the court in giving the instructions above referred to, the judgment must be reversed, and the cause remandd for a new trial.